Filed 7/9/26  In re Aaron F. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Aaron F. et al., Persons Coming Under the Juvenile Court Law. | B350175 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. Marissa M., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 22LJJP00028B–C) |

APPEAL from an order of the Superior Court of Los Angeles County.  Jennifer W. Baronoff, Commissioner.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, and Aileen Wong, Principal Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Marissa M. (Mother) appeals from the juvenile court's order terminating her parental rights to her two minor children, arguing the Los Angeles County Department of Children and Family Services (DCFS) failed to conduct and document an adequate inquiry into the minors' possible Indian ancestry under Welfare and Institutions Code section 224.2[1] as required by California's Indian Child Welfare Act (ICWA). Raising no other issue on appeal, Mother contends a conditional reversal is warranted to allow for proper compliance with ICWA.

We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Mother gave birth to An.F. in April 2023. After receiving a referral that An.F. exhibited withdrawal symptoms at birth and had a positive toxicology test for fentanyl, marijuana, and methadone, DCFS filed a petition under section 300 alleging jurisdiction over An.F. and her four-year-old sibling, Aaron, based on Mother's substance abuse and domestic violence issues between Mother and Joshua F. (Father). (§ 300, subds. (a), (b) & (j).) Mother and Father had just concluded a prior proceeding with DCFS in September 2022 involving Aaron, based on allegations of domestic violence. That proceeding terminated with an order granting Mother sole physical and legal custody of Aaron, and monitored visitation for Father.

On May 15, 2023, Aaron and An.F. were detained and placed in shelter care. The juvenile court subsequently sustained the section 300 petition and declared both children dependents of the court. The court ordered suitable placement, granting DCFS

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

discretion to make a relative placement upon proper approval. Reunification services and drug testing were ordered for Mother and Father, along with counseling and monitored visitation in the case plans for each parent.

In March 2024, the children were placed with Frances S., a paternal great aunt.

After more than 18 months of reunification services, the permanency review hearing was held on February 11, 2025. The juvenile court found that return of the children to Mother and Father would create a substantial risk of detriment to their physical or emotional well-being, and terminated reunification services for both parents. The court set a permanency planning hearing for August 11, 2025. The court encouraged Mother and Father to continue to work on their respective issues, and to discuss the possibility of filing a section 388 petition with their attorneys.

1. **Facts and proceedings related to ICWA**

On Mother's Parental Notification of Indian Status form, she reported her maternal grandmother may have been a member of a Navajo tribe in New Mexico. Mother had no further information. Father signed a Parental Notification of Indian Status form denying Indian ancestry.

At the detention hearing on May 15, 2023, Amia G., maternal grandmother, attended with Mother and told the court there was Navajo ancestry in her family from the "New Mexico area." Maternal grandmother said maternal great grandmother, who was now deceased, had lived on a reservation as a child, but she had no further information. The court ordered DCFS to investigate.

3

In June 2023, after speaking with various extended family members, DCFS prepared an ICWA-030 form for each child that contained the following information:

On the maternal side of the family, the name, date of birth, and place of birth were provided for Mother, maternal grandmother, and Ernesto T., maternal grandfather. As to Mother and maternal grandmother, it was reported they may have Navajo ancestry, Pueblo of Zuni, "unknown locations." One maternal great grandmother was identified as "Nyla" with various surnames, born on the Bread Springs Reservation, who passed in 2014 in Lancaster, California. One maternal great grandfather was identified as Charles B. with no Indian ancestry.

On the paternal side of the family, the name, date of birth, and place of birth were provided for Father, Brenda M., paternal grandmother, and Manuel F., paternal grandfather. As to Father and paternal grandfather, it was reported they had possible Navajo ancestry, noting "Navajo, Pueblo Isleta; New Mexico–See Addendum [¶] Not enrolled at this time." Both paternal great grandmothers were identified and reported as deceased: Helen G. with no known Indian ancestry, and Celine V., with a place of birth in Albuquerque, New Mexico, and possible Indian ancestry noted as "Navajo, Pueblo Isleta; New Mexico." Both paternal great grandfathers were also identified by name (Ernie M. and Gregorio F.), with dates of birth, and places of birth, neither of which had any known Indian ancestry.

In section 7c regarding whether any family members had lived on tribal land, the information regarding maternal great grandmother was repeated. She was identified as Irene S. (aka Nyla) and the reservation was listed as the Bread Springs Reservation in New Mexico. In section 7d regarding other

4

relatives, a paternal great, great grandmother was identified as Priscilla V. with a connection to the Pueblo Isleta tribe, followed by a reference to see the attached addendum.

All other boxes on the ICWA-030 form stated only: "Unknown/Information Not Provided–See Addendum."

The attached addendum summarized various conversations with family members about the family's Indian ancestry and detailed some additional information.

On Mother's side of the family, there was additional information about maternal great grandmother Nyla, whose birth name was Irene S. Maternal grandmother reported she spoke with her aunt and learned that maternal great grandmother had not only lived on the Bread Springs Reservation, but was also born on the reservation and the family believed the reservation was located somewhere in the "Gallup/Fort Defiance/Window Rock" region of New Mexico. Mother reported that "Great Uncle Benny," the brother of Nyla, might have more information. Multiple efforts to obtain followup information from Mother about Uncle Benny were unsuccessful. Maternal grandmother reported that Nyla and Uncle Benny were adopted. Maternal grandmother also reported that her father, Paz G., may have been born in New Mexico with a possible birth date of April 22, 1957. Maternal grandmother had no contact with her father, and therefore had no other information to share about him.

On father's side of the family, DCFS documented several calls to paternal grandmother that were not returned. However, paternal grandfather told DCFS the only possible Indian heritage in his family was through paternal great grandmother, who passed away in 2015 in Canyon Country, California, and that her middle name was Helen. Paternal grandfather also identified his

5

maternal grandfather as Manuel V., who was born in 1899 and passed away in either 1982 or 1983 in Los Angeles, California.

Paternal grandfather reported having an "Uncle Tom" who purportedly received "financial compensation" from a tribe, but he had no other information and did not have contact with other family members to verify. He told the social worker he would look to see if he had any other information. In a followup call, he reported he could find no contact information for his Uncle Tom. Paternal grandfather said he knew of no family members who had lived on a reservation, or had gone to an Indian school or medical clinic. He said his sister, Celina F., might have information and he provided her phone number. The social worker reported that Celina F. confirmed some of the information provided by paternal grandfather, and also reported that Manuel V., paternal great, great grandfather, was part Navajo, and that Priscilla V., paternal great, great grandmother, was connected to the Pueblo Isleta tribe and her heritage had been confirmed by a DNA test.

The ICWA notices with an attached addendum were mailed on June 26, 2023, to Mother, Father, the regional Bureau of Indian Affairs in Sacramento, California, the Department of the Interior in Washington D.C., California Office of Tribal Affairs, the Colorado River Indian Tribes in Parker, Arizona, Navajo Children and Family Services in St. Michaels, Arizona, Ramah Navajo School Board, Inc., in Pine Hill, New Mexico, Pueblo of Zuni in Zuni, New Mexico, and Pueblo of Isleta in Isleta, New Mexico. Certified receipts confirmed the ICWA forms were received by all recipients between June 30, 2023, and July 10, 2023.

Thereafter, the Ramah Navajo School Board advised DCFS by letter that ICWA inquiries were handled by the Navajo Nation and that they had forwarded the ICWA forms to them for review. The Navajo Nation initially responded on August 2, 2023, that it would take time to review its records. In a followup letter dated October 25, 2023, Navajo Nation reported that the children were not eligible for enrollment. Pueblo of Isleta Social Services responded on July 17, 2023, that the children were not listed members and did not have an application pending. A separate response from the Pueblo of Isleta dated July 11, 2023, explained that the children did not meet the standard for membership (one-quarter Isleta blood) and therefore were deemed ineligible. On August 2, 2023, the Zuni Tribe in New Mexico likewise responded the children were not eligible for membership because tribal eligibility required a minimum of one-quarter Zuni Indian blood.

The Colorado River Indian Tribes did not respond until February 18, 2025. Like the other tribes, it determined the children were not eligible for membership. A second letter on May 20, 2025, relayed the same ineligibility determination.

Throughout 2024, DCFS continued to reach out to extended family members to investigate the family's possible Indian heritage. Numerous phone calls to parents and grandparents were made attempting to discern if any further ancestry information or contact information had been discovered. More often than not, DCFS did not receive return phone calls, including efforts to reach Joseph F., a paternal uncle.

On February 13, 2024, paternal great aunt, Frances S., told a social worker she believed her family had possible Yaqui ancestry but she had no other information. On April 4, 2024, Frances S., who had recently become the children's caregiver,

repeated this belief.  However, when asked for other information to verify her belief, she said, "My parents are dead; my grandparents are dead; everybody is gone."  She told the social worker her eldest sister might have more information, but she declined to give her sister's contact information to DCFS.  Instead, she said she would talk to her sister and report back to DCFS if she had any additional information.

In July 2024 and December 2024, DCFS reported it had obtained no new information on the family's Indian ancestry.

At the status review hearing on January 15, 2025, paternal grandmother was present.  The court asked her whether she had any information on the family's Indian heritage.  Paternal grandmother said she recalled her mother and grandmother mentioning possible ancestry, but she had "no idea" about any particular tribe or any further information.  When asked whether she had heard the family had possible Yaqui heritage, she said "I have no idea."  She suggested her aunt, Patricia A., might know something and gave her phone number to the social worker.  The court ordered DCFS to attempt contact with Patricia A.

DCFS subsequently reported a social worker spoke with Patricia A. on January 30, 2025.  Patricia said she had no specific knowledge of any Indian heritage, but she did recall her mother mentioning possible Navajo ancestry, not Yaqui.  She had no other information, just a general recollection of her mother saying so.

At the section 366.22 hearing on February 11, 2025, the juvenile court indicated that any tribe that had not responded should be renoticed.  Counsel for DCFS said it believed two tribes may not have responded yet but had received notices:  Colorado River Indian Tribes and Ramah Navajo School Board, Inc.

The court responded, "[s]o to the extent that they still have not received responses from those tribes, the Department a [*sic*] does need to renotice them."

DCFS subsequently reported that all tribes that had been sent ICWA forms had responded the children were not eligible for enrollment.

On June 11, 2025, the juvenile court found it had no reason to know or believe that ICWA applied.

## 2. Order terminating parental rights

In the section 366.26 report, DCFS reported that the minors remained in the home of paternal great aunt Frances S. DCFS recommended adoption by paternal great aunt as the permanent plan for both children.

At the contested hearing on October 22, 2025, the juvenile court heard testimony and argument on the parental benefit exception to adoption. The court found the exception did not apply, and terminated mother's and father's parental rights to Aaron and An.F. Adoption was identified as the permanent plan, with paternal great aunt identified as the prospective adoptive parent.

This appeal followed.

## DISCUSSION

California's ICWA, and the federal legislation on which it is based (25 U.S.C. § 1901 et seq.), "are unique statutory schemes that are intended to protect Native American heritage, cultural connections between tribes and children of Native American ancestry, the best interests of Indian children, and the stability and security of Indian tribes and families." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125 (*Dezi C.*).) In order to effectuate these goals, ICWA imposes a duty of inquiry on DCFS to determine

9

whether each child that comes under its jurisdiction is or may be an Indian child, and that duty is ongoing throughout the course of the dependency proceeding.  (*Id*. at pp. 1131–1132; see also § 224.2, subd. (a) [county welfare agencies have "an affirmative and continuing duty to inquire" whether dependent minor "is or may be an Indian child"].)

In her sole contention on appeal, Mother argues that DCFS failed to conduct and document an adequate ICWA inquiry.  She says the ICWA forms provided to the tribes were deficient and confusing, and that DCFS either failed to comply with the court's order to renotify certain tribes, or it did not properly document those efforts.  Mother says the record therefore does not support the finding by the juvenile court that ICWA did not apply, and the order terminating parental rights must be conditionally reversed for proper compliance with ICWA in accordance with *Dezi C*., *supra*, 16 Cal.5th 1112.  We are not persuaded.

*Dezi C*. instructs that "the juvenile court's fact-specific determination that an [ICWA] inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review.  [Citations.] ' "On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case." ' " (*Dezi C*., *supra*, 16 Cal.5th at p. 1141; accord, *In re K.L.* (2026) 120 Cal.App.5th 989, 995.)

Here, during its investigation, DCFS spoke to numerous family members to attempt to ferret out relevant information bearing on whether Aaron and An.F. had Indian ancestry.  They spoke with the parents, the maternal grandparents, the paternal grandparents, two paternal great aunts, and one paternal great,

10

great aunt. Additional extended family members were contacted, and either DCFS did not receive replies, or the contact was made by family members because those individuals did not want their contact information provided to DCFS. Other extended family members could not be reached because the family had no contact with them, or they were deceased.

DCFS's efforts in reaching out to extended family members was more than sufficient. In discharging its duty to inquire, DCFS was not required to independently find " 'unknown relatives and others who have an interest in the child, merely to make reasonable inquiries. The operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked.' " (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140; accord, *In re K.L.*, *supra*, 120 Cal.App.5th at p. 996 [DCFS not required to track down relatives not involved in the dependency proceeding, or to "hound" family members who say they will provide information, or " 'cast about' for investigative leads"]; *In re H.B.* (2023) 92 Cal.App.5th 711, 720.)

Mother does not argue that DCFS failed to diligently attempt to speak with extended family members. Rather, Mother says the ICWA forms forwarded to the tribes were materially misleading and deficient. Indeed, Mother urges us to find they were the equivalent of burying the truth.

Mother points to two purported omissions. She says the ICWA-030 forms failed to identify maternal great grandfather Paz G., noting instead only "Unknown/Information Not Provided– See Addendum." Mother says the information about Paz G. was buried in the addendum, namely the information from maternal grandmother that Paz G., with whom she had no contact, may

11

have been born in New Mexico and his birthdate may have been "04/22/1957(?)." Mother also points to the failure to identify paternal great, great grandfather Manuel V. in the "other relative" section of the ICWA form. Mother says any tribe would not bother looking at the addendum for additional relatives because section 7d only mentioned paternal great, great grandmother Priscilla V.

First, we disagree with Mother's characterization of the ICWA forms regarding Manuel V. All of the known information about paternal great, great grandfather Manuel V. was provided in the addendum attached to the ICWA forms, even if his name was not listed in the forms. The addendum was not difficult or time-consuming to read, taking little more than a couple of minutes to review for any additional information supplementing the information stated in the form. Consequently, we do not agree the forms and addendum were materially misleading regarding Manuel V. Our review is "not a mechanistic analysis" of statutory compliance. (*In re H.B.*, *supra*, 92 Cal.App.5th at p. 720.) We presume the tribes reasonably review the information provided to them, and the forms presented here did not require any extraordinary effort to glean the relevant information.

Second, even assuming it was error for DCFS to state in the ICWA form that the second maternal great grandfather was unknown, when in fact Paz G.'s name and possible birth date in New Mexico were known and stated in the addendum, the error was harmless. Mother made no claim and provided no information that any Indian ancestry was suspected through Paz G.'s lineage. (See, e.g., *In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 577 [in the absence of information the

12

mother's family history was relevant to the tribe's inquiry, "there is no basis upon which to conclude that the outcome would have been different"]; *Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 784 [where parent did not claim a direct connection to any tribe, there was no basis to conclude providing a correct year of birth would have produced a different result on the question of the child's Indian ancestry].)  As we explained above, this is not a situation where DCFS's inquiry was inadequate.  Any assumed error was only in the presentation of the information to the tribes for their review.  Thus, the conditional reversal required in *Desi C.* is not applicable here. (*Desi C.*, *supra*, 16 Cal.5th at p. 1145 ["when an initial Cal-ICWA inquiry is inadequate, conditional reversal is warranted in order to develop the record and cure the inadequacy"].)

Nevertheless, we note the better practice for DCFS to follow in the future would be to include all known information clearly in the ICWA-030 form to the extent possible, and to only rely on an addendum for additional facts for which there is no room on the form itself.  Furthermore, in providing information to tribal entities, DCFS should focus on the information that is relevant to their inquiry.

Mother also argues the record does not show whether DCFS renoticed two tribes as ordered to do so by the juvenile court, or if it did, the record does not show what was contained in those notices.  Again, our review of the record does not support Mother's argument.

At the hearing in February 2025, counsel for DCFS indicated a belief that the Colorado River Indian Tribes and the Ramah Navajo School Board, Inc., may not have served responses to the ICWA forms served in June 2023.  Accordingly, the court

13

ordered as follows: "[s]o to the extent that they still have not received responses from those tribes, the Department a [*sic*] does need to renotice them."

However, the record demonstrates that counsel was mistaken, as the Ramah Navajo School Board, Inc. had in fact responded on July 6, 2023, within a couple of weeks of having received the ICWA forms. There was no basis for DCFS to serve them again. The response from Colorado River Indian Tribes was delayed but was received within days of the court's order of February 11, 2025. A second response, repeating the no eligibility determination stated in the first, was sent to DCFS in May 2025. The record demonstrates nothing more than a delayed response by one entity to the ICWA forms served in June 2023.

## DISPOSITION

The juvenile court's order terminating parental rights to minors Aaron and An.F. is affirmed.

VIRAMONTES, J.

WE CONCUR:

WILEY, Acting P. J.

SCHERB, J.

14